730 So.2d 503 (1999)
STATE of Louisiana, Appellee,
v.
James KOON, Appellant.
No. 31,177-KA
Court of Appeal of Louisiana, Second Circuit.
February 24, 1999.
*506 Louisiana Appellate Project by Amy Ellender, Mer Rouge, Counsel for Appellant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Madeleine Slaughter, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS and CARAWAY, JJ., and PRICE, J. Pro Tem.
WILLIAMS, Judge.
The defendant, James Koon, was indicted by a Ouachita Parish grand jury for second degree murder, a violation of LSA-R.S. 14:30.1. After a jury trial, the defendant was convicted as charged and sentenced to serve life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant urges several assignments of error, including allegations that the evidence was insufficient to support a verdict, the sentence is excessive and the trial judge erred in allowing inadmissible evidence to be presented to the jury. For the following reasons, we affirm the defendant's conviction and sentence.

*507 FACTS
The defendant, James Koon, resided with Leticia Lewis and her three children, Jonathon Lewis, Jonterio Lewis and the victim, eight-month-old David Ealy, in a house located on South Fourth Street in Monroe, Louisiana. At the time of the victim's death, the family had resided at this address for approximately three weeks. Prior to moving to the residence on South Fourth Street, the defendant, Lewis and the three children lived in a duplex on Renwick Street in Monroe for approximately one month. The defendant was Lewis's boyfriend, however, he was not the father of any of her children.
On September 13, 1995, Lewis left the residence at approximately 7:30 a.m. to take her two older children, Jonathon and Jonterio, to school. In a statement to the Monroe Police Department, Lewis stated that when she left to take the children to school, David was asleep in the bed. Lewis stated that when she returned, the defendant met her outside at the car and asked her to go to the store and buy a newspaper. Lewis stated that she went to purchase the newspaper and returned home at approximately 8:45 a.m. Upon returning home, the defendant informed Lewis that David had fallen out of the bed while she was gone and that he picked the victim up from the floor, changed his diaper, gave him a bottle and put him back to bed. Lewis and the defendant sat on the sofa, and eventually, went back into their bedroom. Shortly thereafter, the defendant went into the children's room to check on David and, according to the defendant, he noticed mucus coming from David's nose and called for Lewis. At approximately 8:56 a.m., Lewis called 911 and, with the assistance of the 911 operator, she attempted cardiopulmonary resuscitation ("CPR") on the victim and continued until the emergency medical technicians arrived. The victim, David Ealy, was transported to the emergency room at St. Francis Medical Center. According to Dr. David Sullivan, one of the state's expert witnesses, the victim died as a result of a fractured skull prior to his arrival at the emergency room.
After a jury trial, the defendant was found guilty of second degree murder and sentenced to serve life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant appeals.

Assignment of Error No. 1
The defendant argues that the evidence was insufficient to support a conviction of second degree murder. More specifically, the defendant contends that the evidence failed to show that he inflicted the fatal wound to the victim.
The record does not indicate that the defendant filed a motion for post-verdict judgment of acquittal. However, this court will review a sufficiency of the evidence issue even when the issue is raised solely by an assignment of error. State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273.
The relevant inquiry when reviewing a conviction for the sufficiency of the evidence is whether, upon viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard, initially enumerated in Jackson, and now legislatively embodied in LSA-C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Cotton, 25,940 (La.App.2d Cir.3/30/94), 634 So.2d 937. For circumstantial evidence to sustain a conviction, upon assuming every fact to be proved that the evidence tends to prove, it must exclude every reasonable hypothesis of innocence. State v. Cotton, supra. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Id.
Under Jackson v. Virginia, supra, the state bears the burden of negating any reasonable probability of misidentification in cases where the defendant asserts he was not the perpetrator or he remains silent. State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, *508 if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847. The appellate court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Cotton, supra.
In order to convict the defendant of second degree murder, the state had to prove beyond a reasonable doubt that the defendant killed David Ealy while possessing specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1; State v. Washington, 30,866 (La.App.2d Cir.8/19/98), 716 So.2d 936; State v. Starr, 28,934 (La.App.2d Cir.12/11/96), 685 So.2d 424.
Dr. Dennis Sullivan, an expert in emergency room medicine, testified during the trial that he was the emergency room physician on duty at St. Francis Medical Center when David Ealy was brought to the hospital. According to Dr. Sullivan, when David arrived at the hospital, his skin was gray and cool, the back of his head was injured and he had no vital signs. After examining the victim, Dr. Sullivan concluded that he had died prior to the paramedics being summoned. Dr. Sullivan's final diagnosis was that the victim suffered from cardiorespiratory arrest, an occipital skull fracture, a right ankle fracture and older fractures to the left forearm and possibly the right forearm.
Dr. Sullivan testified that David had been dead for some time before he arrived at the hospital, but he could not give the exact time of his injury. Based on the fact that the victim's body temperature had cooled, the skin had turned gray and the cardiac activity had completely stopped, Dr. Sullivan concluded that the child had been dead for approximately twenty or thirty minutes.
Dr. Steven Hayne testified as an expert in pathology. He performed the autopsy of David and concluded that the child appeared to be well nourished, with bruises on his forehead, above his left temple, near his ears and on his back. Dr. Hayne opined that these injuries were inflicted around the time of David's death. There were two small abrasions on David's mouth that were attributed to the endotracheal tube that was used in the effort to resuscitate him.
After examining David's x-rays, Dr. Hayne testified that there were healing fractures in David's left and right forearms which did not occur around the time of death. The x-rays were sent to the Kempe Institute in Denver, Colorado to a pediatric forensic radiologist to confirm the presence of healing fractures. A report from Dr. Timothy Kutz of the Kempe Institute confirmed that there were fractures in the left and right forearm, the right tibia, the right fibula and the skull. The report indicated that the fractures in the long bones were old, but the fracture in the skull was recent. According to Dr. Kutz, the oldest fracture occurred approximately three weeks before death.
Dr. Hayne concluded that the cause of David's death was cranial cerebral trauma secondary to blunt force trauma caused by a fracture at the left back of his skull. According to Dr. Hayne, the fatal injuries were not consistent with a child falling out of bed. Instead, they were indicative of more than one blow to the child. The older injuries indicated probable abuse occurring within three weeks of death. Dr. Hayne opined that the injury to the skull was caused by a blunt instrument with a large surface area and that bruising from the skull fracture probably would have appeared within 10 minutes of the injury. Dr. Hayne further testified that there was no evidence that David's bones were weaker than normal, and he could not tell what caused the long bone fractures.
Dr. Edward Gustavson testified as an expert in pediatric medicine. He reviewed David's x-rays and medical reports. Dr. Gustavson concluded that the right forearm was fractured within two weeks of the child's death and the left forearm was fractured ten to twenty days before the child's death. Dr. Gustavson opined that, because the rate of healing appeared to be different, the child's arms were broken at different times. He also noted that David had suffered from a fracture of the right foot and ankle which occurred between two weeks and a month prior to the child's death. Dr. Gustavson testified that the skull fracture was a new *509 injury and that it would have killed the child immediately. He described the child's head as being "crushed."
According to Dr. Gustavson, none of David's fractures could have been caused by falling out of bed. He testified that David suffered from battered-child syndrome and that children who suffered from this syndrome have a pattern of abuse and often have head and long bone injuries. Dr. Gustavson opined that if the limb injuries were caused by falls, the falls would have to have been from thirty to fifty feet, and it would take at least a three to five-story fall to cause a head injury similar to the type that David suffered.
Dr. Gustavson further opined that David's head injury was caused by a blunt object such as a boot or a shoe being driven into the skull with a tremendous force. He concluded that David did not suffer from a calcium deficiency or bone deformities. He also testified that David showed no signs of osteogenesis, a disease which causes a child to have spontaneous fractures.
Dr. Jose Bermudez testified as an expert in neurosurgery and pediatric neurosurgery. Dr. Bermudez reviewed records provided by the police department, which included photographs of David, the pathology report, the post-mortem study and the medical records from St. Francis Medical Center. Dr. Bermudez opined that David would have lost consciousness immediately upon the impact to his head as his brain would have swollen almost instantly. He noted that David had a fracture at the base of his skull and a severe bruise on the back of his head which probably appeared within a few minutes after the injury was inflicted. According to Dr. Bermudez, after the injury occurred, the child probably was not conscious and probably had trouble breathing. He opined that the child's breathing would have been erratic and he may have died instantly. Dr. Bermudez felt that even someone without medical training would have known that something was wrong with the child. Dr. Bermudez testified that all patients react differently to injuries, but most children less than a year old react the same to the type of injury that David suffered. According to Dr. Bermudez, a person with an injury like David's could not live for a few hours, but could live for a few minutes. He felt that if the child did not die instantly, the child would be unconscious, having difficulty breathing and turning blue or foaming at the mouth.
Lila Mae Jackson, Leticia's mother, testified that she often visited Leticia and the children when they lived on Renwick Street. According to Jackson, the children were always well fed and she never saw any marks or bruises on them. Jackson testified that she saw the children twice after they moved to South Fourth Street, the last time being the weekend before David's death. The children were with Jackson from Saturday afternoon until Sunday morning when the defendant and Lewis picked them up. Jackson testified that David was fine that weekend, other than he was a "little fussy and had a fever" which Jackson attributed to the fact that he was teething. She further testified that she did not notice any bruises on David and that he was able to stand and hold his bottle.
Chlonda Logwood testified that she lived next to Lewis on Renwick Street and that she took care of Lewis' children during the summer of 1995 while Lewis worked. According to Logwood, she never saw any bruises on David, and had never heard the children screaming or being thrown against the wall.
Arthur Nicholson testified regarding conversations that he had with the defendant while they were incarcerated. Nicholson testified that he and the defendant were cellmates at the Ouachita Parish Correctional Center from April until September 1996. He further testified that the defendant told him that David died as a result of a fall that occurred a day or two before the child died. According to Nicholson, the defendant told him that, a day or two before the child died, he threw the child from the bed because the child would not stop crying.
Neither the defendant nor Lewis testified at trial. However, Rosie Lee Jackson, the defendant's mother, testified that she met Lewis at some time in late August or September 1985. She testified that on one occasion *510 she saw Lewis throw David some distance onto a bed. According to Jackson, Lewis told her that David was "crying and getting on her nerves."
Brenda Koon Brown, the defendant's sister, testified that she visited the defendant and Lewis almost everyday when they lived on Renwick Street. She testified David seemed unhappy because he was always crying, and Lewis acted as if she did not care about the child. According to Brown, the only injuries to David that she noticed were two bumps on his head. She stated Lewis informed her that David had fallen out of the bed.
Based on the evidence presented by both parties during the trial, the jury found the defendant guilty of second degree murder. The jurors had to make certain inferences to reach their verdict. Although the evidence against the defendant was circumstantial, it established that within the last month of David's life, he had been severely abused. The medical testimony revealed that David's death was not accidental since falling off of the bed would not produce the force necessary to crush the child's skull. It also revealed that the child died within minutes, if not instantly, after receiving the injury to his skull. While the instrument used to inflict the fatal injury was not determined, the person who injured the child had to exert a great deal of force in injuring the child. The force used to inflict the fatal injury supports the fact that the assailant was acting with specific intent to inflict great bodily harm.
While the evidence presented at trial was circumstantial, it was sufficient to support the conviction. Only two people had the opportunity to inflict the fatal injury to the child, the defendant and Leticia Lewis. The defendant and Lewis made statements to the police on the day that David Ealy was killed. According to Lewis, after leaving to take the children to school, she returned home after approximately one hour. The defendant's statements to police officers revealed that, upon returning from taking her children to school and going to buy a newspaper, Lewis did not go into the children's room to check on David. Therefore, according to the defendant's statements, the only person to have contact with David immediately prior to his death was the defendant, James Koon.
The evidence presented was sufficient to satisfy a rational juror that the defendant was guilty of second degree murder beyond a reasonable doubt. This assignment is without merit.

Assignment of Error No. 10
By this assignment, the defendant contends that since the state failed to link David's prior injuries to the defendant, the trial court erred in allowing the state to introduce evidence of the child's prior injuries.
After a pre-trial hearing, the trial court ruled that evidence of the child's prior injuries was not admissible as other crimes evidence. However, the trial court ruled that evidence of the child's prior injuries was admissible as evidence that the child suffered from child abuse syndrome and as evidence of the condition of the child's body at the time of death. In response to an application for writs, this court upheld the trial court's decision. State v. Koon, 29,814-KW (La. App.2d Cir.2/20/97).
The defendant now alleges that the trial court erred in allowing the state to introduce evidence of the victim's prior injuries as proof that the fatal injury was intentional and not accidental. The defendant argues that Dr. Gustavson's testimony concerning the prior injuries was never sufficiently linked to the defendant and that the evidence that the child suffered from child abuse syndrome was not reliable under the Daubert/Foret test.
The trial court is to perform a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Foret, 628 So.2d 1116 (La.1993). The reliability of scientific evidence is to be ensured by the requirement that there be a valid scientific connection to the pertinent inquiry. This connection is to be examined in light of a preliminary assessment by the trial court of whether the reasoning and methodology underlying the testimony is scientifically *511 valid and of whether the reasoning or methodology can be applied to the facts at issue. Daubert v. Merrell Dow Pharmaceuticals, Inc., supra. In considering whether scientific evidence is reliable, the trial court should consider the following factors suggested in Daubert: (1) the testability of the expert's theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.
The evidence of the prior injuries was relevant to prove the intent requirement of second degree murder. The evidence demonstrating battered-child syndrome assisted in proving that the child died at the hands of another and not by falling off of a bed, and this evidence also tends to show that the person inflicted the injuries intentionally. Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). When offered to show that certain injuries are a product of child abuse, rather than an accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who inflicted the injuries. Estelle v. McGuire, supra.
In addition to being relevant, the evidence of the victim's prior injuries was also reliable. In the pre-trial hearing, the trial court performed its gatekeeping function as it heard the credentials of Dr. Gustavson and the methodology behind child abuse syndrome. Dr. Gustavson has more than 25 years experience in pediatrics and more than 20 years experience in dealing with cases of child abuse. He noted that the syndrome was first reported in the 1960s by Dr. Kempe and that a great deal of research has been devoted to the syndrome. Dr. Gustavson's testimony was sufficient to show that the methodology behind child abuse syndrome was reliable. The trial court did not err in finding the testimony concerning the child's prior injuries to be admissible evidence of child abuse syndrome.
Additionally, the testimony concerning the prior injuries was also relevant to establish the condition of the child's body at death. The defendant claims the prejudicial effect of this evidence outweighs its probative value. However, this is not the case as the evidence was relevant to show that the child's death was not an accident, and the prejudicial effect of the evidence does not override the probative value of the evidence. This assignment lacks merit.

Assignment of Error No. 12
The defendant alleges that the trial court erred in admitting photographs of the residence on South Fourth Street and in allowing testimony regarding the items in the photographs. The defendant contends that the photographs were irrelevant, and, even if they were relevant, their prejudicial effect outweighed their probative value.
Relevant evidence is evidence which tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401; State v. Mamon, 26,337 (La.App.2d Cir.12/16/94), 648 So.2d 1347. The trial judge has considerable discretion in determining the relevancy of evidence, and the ruling will not be disturbed absent an abuse of discretion. State v. Miles, 402 So.2d 644 (La.1981); State v. Mamon, supra.
Included in the state's exhibit were photographs of holes in the sheetrock wall in the master bedroom, the children's bedroom and the sheet that was on the children's mattress. The trial judge found that the photos were relevant as photographs of the crime scene. The trial court's ruling was correct. The admission of the photographs into evidence was not an abuse of discretion as the photos were relevant to give the jurors a view of the crime scene. The probative value of presenting the jury a view of the crime scene outweighed the prejudicial effect of the photographs. This assignment is without merit.

Assignment of Error No. 3
The defendant contends that the trial court erred in denying various motions for mistrial. The defendant also requests that these allegations be reviewed for reversible *512 error should this court find that a mistrial was not the appropriate remedy.
Mistrial is a drastic remedy which is warranted only when substantial prejudice would otherwise result to the accused. State v. Harris, 28,517 (La.App.2d Cir.8/21/96), 679 So.2d 549, writ denied, 96-2954 (La.9/26/97), 701 So.2d 975. The trial court has the discretion to determine whether a fair trial is impossible or whether a jury admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for a mandatory mistrial, and the ruling will not be disturbed absent an abuse of discretion. State v. Powell, 598 So.2d 454 (La.App. 2d Cir.1992).
The defendant alleges that the trial court erred in denying a mistrial based on the defective form of the amended indictment. The grand jury indicted the defendant for second degree murder. The prosecutor later amended the indictment to add Leticia Lewis as a defendant. The trial court denied the motion to quash the amended indictment, but the court granted the motion for severance so that the defendants would have separate trials. The defendant moved for a mistrial after the amended indictment was read to the jury and prior to the first witness being 565 13called at trial. The defendant also argues that the amended indictment should have been signed by the grand jury foreman instead of the prosecutor.
The prosecutor may make substantive amendments to a grand jury indictment before trial begins. State v. Neslo, 433 So.2d 73 (La.1983). The prosecutor's amendment of the indictment was allowed by law, and the defendant has not shown that he was prejudiced by the amendment. Therefore, this assignment lacks merit.
The defendant alleges that the trial court erred in allowing the admission of David Ealy's autopsy photographs. The photographs showed the child's brain and the effect of the skull injury on his brain. The defendant requested a mistrial based on the fact that these photographs were allowed into evidence. The defendant objected to the admission of these photographs claiming that they were gruesome.
The test for admissibility of gruesome photographs is whether their probative value outweighs the possible prejudice which may result from showing them to the jury. State v. Stokes, 26,003 (La.App.2d Cir.6/22/94), 639 So.2d 395, writ denied, 94-1880 (La.11/11/94), 644 So.2d 387. Notwithstanding the erroneous admission of evidence, a verdict will not be reversed if the reviewing court, assuming that the damaging potential of the improperly admitted evidence is fully realized, determines that the error was harmless beyond a reasonable doubt. State v. Harris, 97-0300 (La.4/14/98), 711 So.2d 266; State v. Wille, 559 So.2d 1321 (La.1990). Reversal is mandated only when there is a reasonable possibility that the evidence might have contributed to the verdict. State v. Harris, supra; State v. Wille, supra.
While the photographs are somewhat gruesome, it is unlikely that their admission contributed to the verdict. The jurors knew at the very least that the last month of the victim's life was quite painful and violent. Considering the circumstances, the defendant has not shown that the photographs so prejudiced the jury that they would have contributed to the verdict. Therefore, a mistrial was not mandated.
The defendant argues that the trial court erred in allowing Dr. Hayne to give opinion testimony regarding whether David Ealy was a victim of child abuse. Dr. Hayne testified that the fractures that the victim sustained and the injury to his skull indicated probable abuse over the last three weeks of the child's life. The defendant objected arguing that Dr. Hayne was not qualified to give this opinion. The trial court refused to grant a mistrial.
Considering the nature of the child's injuries, the trial court did not abuse its discretion in finding that Dr. Hayne was qualified to give his opinion on this matter. Even if Dr. Hayne was not qualified to conclude that the child suffered abuse, the defendant was not prejudiced by this opinion since Dr. Gustavson also opined that David Ealy was a victim of child abuse. Thus, this evidence *513 was cumulative in nature. This assignment lacks merit.
The defendant alleges that the trial court erred in denying his motion for mistrial when the prosecution elicited a response from its witness which the defendant claims violated his right against self-incrimination. The response that the defendant complains of took place during the prosecution's redirect examination of Dr. Gustavson.
Q. Doctor, if someone had lived with this child for a period of seven monthsI mean seven weeks would heshould that person be able to know the difference in the first four weeks from the last three weeks of the behavior of this child.
A. Yes.
The defendant objected to this question and asked for a mistrial. The trial court denied the request.
The defendant argues that the reference to the seven-week time period was clearly a reference to him, and therefore, violates his right against self-incrimination. The defendant does not cite any authority to support this contention. Although the question did in fact make a reference to the defendant, there was no violation of the defendant's right against self-incrimination. This ground had been covered by prior statements made by Dr. Gustavson regarding the question of whether the defendant should have been aware of the victim's injuries. Therefore, the defendant has not shown that he was prejudiced by the question and response to which he objected. This assignment is without merit.
The defendant contends that the trial court erred in denying his motion for a mistrial when the prosecutor failed to lower the volume on the tape recorder when the defendant made a reference to other crimes he had committed during his first taped statement to the police.
When the tape was played at trial, the prosecutor was instructed to lower the volume when the recording reached the point where the defendant made the reference to getting into "some trouble." Defense counsel asked for a mistrial as he said that he could hear the defendant's statement even after the prosecutor lowered the volume. However, the trial judge and two sheriffs deputies, who were sitting four to five feet away from the jury, stated that they did not hear the statement. Further, the trial judge ruled that the statement did not constitute a reference to other crimes.
Since no one other than the defense counsel claimed to have heard the statement, there was no basis for finding that the jurors heard the reference to the defendant getting in "some trouble." The trial court did not err in denying the motion for mistrial on this ground. This assignment is without merit.
Finally, the defendant argues that the trial judge erred in refusing to declare a mistrial when the prosecutor elicited the opinion of a witness as to the defendant's guilt.
During the trial, the prosecutor asked Chlonda Logwood if there was any reason she wanted the defendant to go to jail, and Logwood responded that she believed that the defendant killed David Ealy. The defendant objected and asked for a mistrial. The trial judge reprimanded the prosecutor for asking the question, but he did not grant the mistrial. The trial judge admonished the jury that Logwood's opinion was not to be given any consideration during their deliberations.
This statement is governed by LSA-C.Cr.P. art. 771 which calls for a jury admonition in this type of situation and for a mistrial only if an admonition will not assure the defendant a fair trial. The trial judge admonished the jury that Logwood's opinion was not to be given any consideration, and this admonition was adequate to assure the defendant a fair trial. This assignment is without merit.

Assignment of Error No. 11
By this assignment, the defendant argues that the trial court erred in allowing Dr. Sullivan to give an opinion regarding whether the injury to David Ealy's skull could have been caused by a fall from a bed. The defendant objected to Dr. Sullivan's qualification to give such an opinion since he *514 is not a pathologist. The trial court overruled the objection.
The trial judge has great discretion in deciding which witnesses are qualified as experts, and the breadth and scope of that expert testimony. State v. Mays, 612 So.2d 1040 (La.App. 2d Cir.1993); writ denied, 619 So.2d 576 (La.1993). Even if Dr. Sullivan was not qualified to give such an opinion, this statement was not prejudicial to the defendant because both Dr. Hayne and Dr. Gustavson testified at trial that a fall from a bed could not have caused the victim's head injury. As both of these doctors were qualified to give that opinion, Dr. Sullivan's testimony did not prejudice the defendant. This assignment is without merit.

Assignment of Error No. 13
In this assignment of error, the defendant argues that the trial court erred in allowing the jury to hear the defendant's recorded statements to the police. The defendant claims that his statements were not freely and voluntarily given since he was not informed that he was a suspect in the victim's murder before the statements were given.
The state has the burden of proving that a statement given by a defendant was freely and voluntarily given, and not the product of threats, promises, coercion, intimidation, or physical abuse. LSA-R.S. 15:451; State v. Seward, 509 So.2d 413 (La.1987); State v. Brooks, 505 So.2d 714 (La.1987), certiorari denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). To establish the admissibility of a statement made by an accused person during custodial interrogation, the state must prove that the accused had been advised of his Miranda rights, and that he waived these rights prior to interrogation. State v. Brooks, supra. The determination of a statement's admissibility is within a trial court's discretion, and it should not be disturbed unless it is not supported by the evidence. State v. Brooks, supra.
Officer Rita McCormick testified that, during the time of the first statement, the defendant was not told he was a suspect because it had not been established at the time that his statement was taken. Officer Don Bartley testified that the defendant was informed that he was a suspect prior to the second statement, although he was not under arrest at that time. The officers stated that the defendant was advised of his Miranda rights before making both statements. There was no evidence that the defendant was threatened or coerced in any way.
It is not required to inform a suspect that he is a suspect prior to his giving a statement. However, it is required that the suspect be informed of his Miranda rights prior to giving a statement and that the statement not be a product of coercion. As the defendant was informed of his Miranda rights prior to giving the statements and there was no evidence of coercion, the trial court did not abuse its discretion in admitting the statements into evidence. This assignment of error is without merit.

Assignments of Error Nos. 4,5,7 and 8
By these assignments, the defendant alleges that the trial court erred in imposing an excessive sentence and in not articulating the reasons for the sentence as required by LSA-C.Cr.P. art. 894.1.
It is the legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. State v. Dorthey, 623 So.2d 1276 (La.1993). The decision to assess mandatory life sentences for certain felonies is within the prerogative of the legislature. State v. Parker, 416 So.2d 545 (La.1982). The assertion that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Thompson, 27,512 (La.App.2d Cir.12/6/95), 665 So.2d 643, writ denied, 96-0232 (La.4/26/96), 672 So.2d 679. Thus, the sentence imposed by the trial court was not excessive.
Failing to articulate reasons for the sentence as set forth in LSA-C.Cr.P. art. 894.1 when imposing a mandatory life sentence is not an error because setting forth the factors would be an exercise in futility since the court has no discretion. State v. *515 Williams, 445 So.2d 1264 (La.App. 3d Cir. 1984), writ denied, 449 So.2d 1346 (La. 1984). The sentence imposed by the trial court was a mandatory sentence. Therefore, the trial court did not err in failing to articulate reasons for the sentence. These assignments are without merit.

Error Patent
The defendant alleges as error patent the fact that he was not present at a Prieur hearing on December 9, 1996. The motions to quash and to sever were also heard on this date. The defendant claims that LSA-C.Cr.P. art. 831 required that he be present at the hearing.
LSA-C.Cr.P. art. 834(1) provides that the defendant's presence is not essential to the validity of any hearing or ruling on a preliminary motion. Article 831(A)(4) provides that a defendant charged with a felony shall be present at all times during the trial when the court is determining and ruling on the admissibility of evidence. Article 831(A)(4) is not applicable to this hearing since the hearing was held prior to the trial. In any event, the defendant's presence was waived by one of his attorneys and the reason for his absence was not given. Defendant's argument lacks merit.

CONCLUSION
Finding no merit to the defendant's assigned errors, his conviction and sentence are affirmed.
AFFIRMED.